672 P.2d 561
**STATE of Idaho, Plaintiff-Respondent,**

v.

**Gary Alan LANG, aka Dave Gray, Defendant-Appellant.**

No. 14346.

Supreme Court of Idaho.

Nov. 21, 1983.

Robert G. Hamlin, Boise, for defendant-appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., Myrna A.I. Stahman, Deputy Atty. Gen., Boise, for plaintiff-respondent.

HUNTLEY, Justice.

By this appeal, we are asked to re-evaluate the standard used by the magistrates of the state of Idaho in determining the existence of probable cause for issuance of search warrants, in light of the decision of the United States Supreme Court in *Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). *Gates* abandoned the two-pronged test of probable cause established in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), in favor of the more flexible "totality of the circumstances" analysis.

The guarantee against unreasonable search and seizure in article I, § 17 of the Idaho Constitution is substantially the same as the parallel provisions of the Fourth Amendment to the United States Constitution; nevertheless, it is for this court to decide whether to relax the standard for the demonstration of probable cause in accord with this most recent U.S. Supreme Court decision, or whether to retain the more protective criteria of *Aguilar* and *Spinelli* and their progeny as our test.[1]

1. The rule of *Aguilar* and *Spinelli* has been codified in Idaho R.Crim.P. 41(c).

On October 24, 1980, agent Douglas J. Williams of the Idaho Bureau of Narcotics and Drug Enforcement received a tip from an anonymous female caller. The woman stated that Gary Lang had left Boise that morning for Orlando, Florida, where he was going to purchase five to six ounces of cocaine. She said that he would be travelling under an assumed name on a flight from the Boise Airport to Denver, Colorado, with a connecting flight on Delta Airlines to Orlando. The informant also reported that Lang owned a 1971 green Volkswagen "Bug" automobile which would be parked in the long-term lot at the Boise Airport. She said this information was from her personal knowledge.

Agent Williams pursued the tip and spent that afternoon and evening verifying the information. He found a 1971 Volkswagen Bug in the long-term lot at the airport and a license check by the Department of Motor Vehicles revealed that the car was registered to the defendant. Upon inquiring at the Republic Airlines ticket counter, he discovered that the day before, one ticket for Orlando, via Denver, with the connecting flight on Delta Airlines, had been sold. The purchaser had identified himself as Dave Gray, and the ticket was used on the morning of October 24th. It was further established that only one person travelled from Boise to Orlando on that flight and route on that date. Agent Williams also went to Lang's residence, where there was no response to his knock on the door. He also noticed uncollected mail in the post box addressed to Gary Lang. Finally, the agent obtained a photograph of the defendant and a description of his vital statistics from the Idaho Criminal Identification Bureau.

Based on the above recital, agent Williams completed an affidavit and sought a warrant from a magistrate. Probable cause was determined to exist and a warrant containing a detailed description of Lang and authorizing the search of his person and any bags in his possession was issued. The warrant was executed upon Lang's return to Idaho, and cocaine, among other items, was found and seized.

Our experience with the real-life application of the two-pronged test of *Aguilar* and *Spinelli* leads us to conclude that its unduly technical approach restricts the work of law enforcement, without affording a concomitant enhancement of protection from unreasonable search and seizure. The "totality of the circumstances" approach enunciated in *Gates,* together with the interposition of a magistrate between officer and citizen will secure the constitutional guarantee, while insuring that inferences from the evidence are drawn by a neutral and detached mind, "instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." See *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948). The approach in *Gates* affords the magistrate the opportunity "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates,* 103 S.Ct. at 2332, 76 L.Ed.2d at 548. We thus abandon the test of *Aguilar* and *Spinelli* and adopt the "totality of the circumstances" analysis as the standard by which the magistrates of Idaho will determine the existence of probable cause.

Our decision today represents a major shift in our law of search and seizure; however, no purpose would be served by a lengthy exposition of the reasoning behind the policy change, as all the arguments are reviewed thoroughly by the United States Supreme Court in *Gates.*

In reviewing the findings of a magistrate, our function is limited to ensuring that the magistrate had a substantial basis for concluding that probable cause existed. *Gates,* 103 S.Ct. at 2332, 76 L.Ed.2d at 548. Moreover, great deference is to be paid such determinations by reviewing courts. *Spinelli,* 393 U.S. at 419, 89 S.Ct. at 591, 21 L.Ed.2d at 645; *State v. Oropeza,* 97 Idaho 387, 391, 545 P.2d 475, 479 (1976). We find that the magistrate did

have a substantial basis for his finding of probable cause in the case at bar. The opinion of the U.S. Supreme Court in *Gates* is particularly compelling authority in this regard, considering the striking parallels between the facts of the instant case and those in *Gates.*

As in *Gates,* the law enforcement official received an anonymous tip detailing drug and narcotics crimes. *Gates,* 103 S.Ct. at 2325, 76 L.Ed.2d at 540. Both tips included a variety of details, describing future activities of third parties which are not easily predictable, as well as easily obtained facts. See *id.* 103 S.Ct. at 2335, 76 L.Ed.2d at 552. Likewise, the information in reference to existing facts was verified by agent Williams and the future behavior described by the tipster occurred as predicted. *Id.,* 103 S.Ct. at 2335, 76 L.Ed.2d at 551–552. *Gates* has reiterated the value of corroboration of details of an informant's tip by independent police work. *Id.,* 103 S.Ct. at 2334, 76 L.Ed.2d at 550. The destination of the suspect in each case was Florida, further bolstering the finding of probable cause. In addition to being a popular vacation site, Florida is well known as a source of narcotics and other drugs. *Id.* 103 S.Ct. at 2334, 76 L.Ed.2d at 551. Applying the totality of the circumstances analysis to these facts, we conclude that a substantial basis for the magistrate's finding of probable cause existed.

The judgment of the trial court is affirmed.

DONALDSON, C.J., and SHEPARD and BAKES, JJ., concur.

BISTLINE, Justice, dissenting.

Only four justices joined the *Gates* opinion which Justice Rehnquist authored. Although that opinion is now the law insofar as the fourth amendment is concerned, it is *barely* the law, and I see no compelling reason for this court to so precipitately rush to embrace the views therein espoused, if in fact the majority today is doing so. I do

believe that this Court, without saying so, is retreating from any of our cases which may have placed reliance upon the two-pronged test of *Aguilar* and *Spinelli.* But I was never convinced that this Court should have ever bowed down to the *Aguilar-Spinelli* test in the first place,[1] other than when passing on fourth amendment challenges, which is to say that the *Aguilar-Spinelli* test does not ipso facto apply to art. 1, § 17 of the Idaho Constitution, other than that this Court chooses to interpret and apply art. 1, § 17 as the High Court does the fourth amendment of the federal constitution.

Basically, my premise is that state supreme courts are not obliged to parrot the Supreme Court of the United States, but rather should be at least somewhat inclined to individualistic thinking and judgment. In the decade just past the High Court has led the fifty states on a merry chase indeed in the extremely critical area of capital sentencing. As Justice Shepard of this Court so eloquently phrased his concern:

"With all deference and respect to our brethren on the Bench of the United States Supreme Court, I regret that I can neither understand what they have said as a court, where they now stand as a court or where they may be going in this important area of the law involving capital cases and the death penalty."

*State v. Lindquist,* 99 Idaho 766, 775, 589 P.2d 101, 110 (1979).

The judgments handed down by the High Court earlier this year leaves the area perhaps muddier than it was. *See* Part IIB, opinion of Justice Marshall, joined by Justice Brennan, *Zant v. Stephens,* —— U.S. ——, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983): "If this is all *Gregg v. Georgia* stands for, the States may as well be permitted to re-enact the statutes that were on the books before *Furman.*" I have said as much in *State v. Sivak,* 105 Idaho 900, 674 P.2d 396 (1983) and *State v. Creech,* 105 Idaho

---

1. The total embracing of those cases occurred in *State v. Oropeza,* 97 Idaho 387, 545 P.2d 475

(1976), which predated my arrival on the Court.

362, 670 P.2d 463 (1983), where I also pointed out that Idaho's pre-*Furman* statutes, as applied under this Court's case-law holdings would have met consitutional muster under the opinions handed down by the High Court in 1976 (which opinions precipitated Idaho's attorney general into pushing through the legislature the present scheme which deprives an accused of his constitutional right to have his fate determined by a jury).

Today, while I do have some problem with the Court's conclusion that the trial judge did not err, which is reached under the supposedly new "totality" rule of *Gates,* I am wholly unable to see why the other members of the Court fail to consider the better-reasoned views of Justice White, who, in joining the judgment of the Court, wrote separately that:

"Thus, as I read the majority opinion, it appears that the question whether the probable cause standard is to be diluted is left to the common-sense judgments of issuing magistrates. I am reluctant to approve any standard that does not expressly require, as a prerequisite to is-

suance of a warrant, *some showing of facts from which an inference may be drawn that the informant is credible and that his information was obtained in a reliable way.* The Court is correctly concerned with the fact that some lower courts have been applying *Aguilar-Spinelli* in an unduly rigid manner. I believe, however, that with clarification of the rule of corroborating information the lower courts are fully able to properly interpret *Aguilar-Spinelli* and avoid such unduly-rigid applications. I may be wrong; it ultimately may prove to be the case that the only profitable instruction we can provide to magistrates is to rely on common sense. But the question whether a particular anonymous tip provides the basis for issuance of a warrant will often be a difficult one, and I would at least attempt to provide more precise guidance by clarifying *Aguilar-Spinelli* and the relationship of those cases with *Draper* before *totally abdicating our responsibility in the area.* Hence, I do not join the Court's opinion rejecting the *Aguilar-Spinelli* rules." [2]

**2.** Justice Shepard, dissenting in *Oropeza* cast an ominous shadow over this Court's application of the *Aguilar-Spinelli* test in that case, and at the same time anticipated its eventual rejection:

"It is clear that hearsay information received from an informer may furnish sufficient probable cause for the issuance of a warrant. *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *United States v. Harris,* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). Varon, Searches, Seizures and Immunities (2nd ed. 1974). Assuming that *Aguilar* and *Spinelli* maintain vitality following *Harris* (See 40 Fordham Law Review, 687), the only teaching of those cases is that hearsay information supplied by an informer must be more than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation. Statements regarding the reliability of an informer must be more than merely conclusory in nature, *Spinelli,* and these must set forth such underlying circumstances as are necessary to judge the validity of the informer's conclusion, *Aguilar.*

"I find nothing in any of the decisions of the U.S. Supreme Court which requires the affidavit at issue here to be determined insufficient as showing probable cause. In *Jones v. United States, supra,* an affidavit for a search warrant indicated the receipt of information by an unnamed person. There it was held that although the affidavit did not set out affiant's personal observations (as contrasted with the assertion of personal knowledge here), nevertheless other sources (here, police surveillance) provided a substantial basis for crediting the hearsay. In *United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), an affidavit for a search warrant indicated the receipt of hearsay information but such was deemed sufficient because of the strong factual background which buttressed the hearsay and combined to establish probable cause. Some commentators argue that the opinion of the court in *United States v. Harris, supra,* has to some extent blunted the decisions in *Aguilar* and *Spinelli,* but in any event *Harris* held that an affidavit premised on information received from an unknown informer provided sufficient probable cause for the issuance of a search warrant in consideration of the totality of the circumstances which were used to evaluate an affidavit as meeting the standards for probable cause.

*Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 2317, 2350–51, 76 L.Ed.2d 527, 571 (footnotes omitted) (emphasis added).

Being of the same mind as Justice White, I, too, am not moved to so totally abdicate our responsibility in the area. In that regard, my view is fortified by the "merry chase" above mentioned, strengthened further by a strong belief that this Court should not allow itself to be so readily influenced by a bare majority opinion of the High Court when it is this Court which has the sole responsibility where our own Idaho Constitution is concerned, here art. 1, § 17. Long before the Warren Court intervened, and properly so, in the area of constitutional rights for accused persons, the Idaho courts and the Idaho legislatures were forerunners.

"In this jurisdiction, it has always been necessary to establish probable cause as a condition precedent to the issuance of a warrant to arrest and detain a person or seize his property. In *State v. Arregui,* 44 Idaho 43, 254 P. 788 (1927), a search warrant case, this Court held that the affidavit must set forth and disclose some personal knowledge of the underlying facts; the conclusions to be drawn therefrom are for the magistrate to draw. The underlying facts must be 'sufficient upon which to find probable cause for the issuance of the warrant....' *State v. Arregui,* id. at 63, 254 P. at 794. In the promulgation of Rule 4, I.C.R.[3] 'sufficient evidence' to justify a finding of

probable cause became 'substantial evidence.' "

*Jacobsen v. State,* 99 Idaho 45, 53, 577 P.2d 24, 32 (1978) (opinion of Bistline, J.).

Although the majority today, in a footnote, declares that the Court's rule, I.C.R. 41(c) is a codification of *Aguilar* and *Spinelli,* I am unable to see much of a family resemblance. I see more of *Arregui* in Idaho Criminal Rules 41(c) and 4(e) than I do of *Aguilar* and *Spinelli.* In *Struve v. Wilcox,* 99 Idaho 205, 579 P.2d 1188 (1978), a 4–1 Court noted that:

"[T]his Court, in the same year that the Idaho legislature improved the Uniform Extradition Act by adding to Section 15 the safeguard of a probable cause hearing, handed down the landmark decision of *State v. Arregui,* 44 Idaho 43, 254 P. 788, 52 A.L.R. 463 (1927). In *Arregui* a conviction based upon evidence seized under the purported authority of a search warrant was reversed for the lack of probable cause justifying the issuance of a warrant. In that case it was made clear that conclusory statements will not suffice. To justify a finding of probable cause the affiant must disclose some personal knowledge of the underlying facts and set them forth, and 'conclusions must be drawn by the magistrate and not by the affiant.' *Id.* at 63, 254 P. at 794.

'It is not necessary that the facts be sufficient upon which to base a verdict of a jury, but they must be sufficient upon which to find probable cause for

---

"It is well-established that in an evaluation of an affidavit to determine the existence of probable cause great deference should be paid to the decision of the magistrate and his common sense should not be restricted. *Jones v. United States, supra; United States v. Ventresca, supra.* As was stated in *Spinelli* and reiterated in *Harris,* 'A policeman's affidavit should not be judged as an entry in an essay contest.' As was stated in *Aguilar,* 'Thus, when a search is based upon a magistrate's rather than a police officer's determination of probable cause, the reviewing courts will accept evidence of a less "judicially competent or persuasive character than would have justified an officer in acting on his own without a warrant," ibid., and will sustain the judicial determination so long as

"there was substantial basis for [the magistrate] to conclude that narcotics were probably present." ' "

97 Idaho at 393–94, 545 P.2d at 481–82.

3. Rule 4 governs arrest warrants. Rule 41 governs search warrants. Although not entirely alike, both use this identical language: "The finding of probable cause shall be based upon substantial evidence, which may be hearsay in whole or in part provided there is a substantial basis for believing that there is a factual basis for the information furnished." (That I cite the rules should not be seen as evidencing any belief that the Court has constitutionally entered the field of substantive law. Since 1864 the legislature has provided the law governing search warrants. Title 19, Ch. 44, Idaho Code.)

the issuance of the warrant (that crime is being committed).' *Id.*

"This Court 45 years later, in promulgating Rules of Criminal Practice and Procedure, incorporated the spirit and intent of I.C. § 19–505 and § 19–506 (note 11 *supra*) into Rule 4, which requires a finding of probable cause before a requested arrest warrant may issue."

99 Idaho at 211, 579 P.2d at 1194 (footnote omitted).

The Court not only paid homage to *Arregui,* but also to a legislature which in the same year provided a probable cause hearing which was not part and parcel of the Uniform Extradition Act. In that opinion, which dealt with probable cause for issuance of arrest warrants, this Court in footnote 11 also noted as well the statutory requirements prerequisite to the issuance of search warrants:

"Since the passage of Idaho's first territorial criminal code in 1864, our statutes have required a judicial officer's finding of probable cause as essential to effect a seizure of a person or his property without violating the United States Constitution, Fourth Amendment, and the Idaho Constitution, art. 1, § 17. I.C. §§ 19–505 and 506 govern warrants of arrest and provide:

'19–505. The deposition must set forth the facts stated by the prosecutor and his witnesses, tending to establish the commission of the offense and the guilt of the defendant.

19–506. If the magistrate is satisfied therefrom that the offense complained of has been committed, and that there is reasonable ground to believe that the defendant has committed it, he must issue a warrant of arrest.'

I.C. §§ 19–4403, 4404, 4405 and 4406 govern search warrants and provide:

'19–4403. A search warrant can not be issued but upon probable cause, supported by affidavit, naming or describing the person, and particularly describing the property and the place to be searched.

19–4404. The magistrate must, before issuing the warrant, examine on oath the complainant and any witnesses he may produce, and take their depositions in writing, and cause them to be subscribed by the parties making them. 19–4405. The depositions must set forth the facts tending to establish the grounds of the application, or probable cause for believing that they exist. 19–4406. If the magistrate is thereupon satisfied of the existence of the grounds of the application, or that there is probable cause to believe their existence, he must issue a search warrant, signed by him with his name of office, to a peace officer in his county, commanding him forthwith to search the person or place named, for the property specified, and to bring it before the magistrate.' "

99 Idaho at 210–11, 579 P.2d at 1193–94. Hopefully that which the Court said in *Struve* and that which I wrote in *Jacobsen* may have been of some benefit to the magistrates who are requested to issue warrants, and may have guided them from "applying *Aguilar-Spinelli* in an unduly rigid manner." *Gates,* 103 S.Ct. at 2350, 76 L.Ed.2d at 571 (opinion of White, J.). In giving due consideration to both our Idaho and the federal constitutions, all that is required is that the magistrate require that he be presented with sufficient underlying facts, which with inferences properly drawn therefrom, substantiate the conclusions which the magistrate—not the requesting officer—draws therefrom. That is the message of *Arregui* and that is the plain language of the Idaho Code, and has been since the first meeting of the Territorial Legislature in 1864.

Now, it may very well be that what has ever been the rule in Idaho, as evidence by both the Idaho statutes and the *Arregui* opinion, is in essence the newly discovered doctrine of the *Gates* Court—"totality of circumstances." If so, then that Court is to be commended for aligning itself with the views of the Idaho legislature and this Court as set forth in *Arregui.* But it should

not so readily be forgotten that in the years which intervened from *Aguilar* (1964) and *Spinelli* (1969) most state courts, including this one, were perfectly willing to abdicate their responsibility, and did, for the integrity of state constitutions. Now, with the unexpected demise of *Aguilar* and *Spinelli,* it may well be supposed that most state courts will with equal lack of spirit jump to the High Court's "totality of circumstances" doctrine until that, too, perhaps will fall by the wayside. It is to be kept in mind, however, that decisions of the High Court interpreting the Bill of Rights set the minimum guarantees of individual rights, and that there are state courts which do, as they properly may, give truly independent force to their state constitutions which often are more protective of those rights than decisions handed down by the High Court. Nor has the High Court ever intimated that state courts act as clones. Quite the contrary is true. "Our holding, of course, does not affect the State's power to impose higher standards on searches and seizures than required by the Federal Constitution if it chooses to do so." *Cooper v. California,* 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730 (1967). Probably one reason for state court forbearance is that protection of individual rights, whereby the guilty sometimes go free (often to be tried again and then convicted) requires the strongest judicial fortitude—which was especially clear when the Warren Court intervened in states where individual rights were not as well protected as they have been in Idaho—in which states even until this day there are highway signs advocating the impeachment of Earl Warren. Undoubtedly there were rumblings against the four justices of this Court when, in reversing the conviction of Mateo Arregui, they wrote:

> "In the hands of the state courts is placed the power to prevent in part the violation of the rights of a citizen by federal authorities in violation of state and federal constitutions. *This is not only in the power of the state court, but its duty.* If, as said in the Burdeau case, the 4th amendment to the federal constitution 'was intended as a restraint upon the activities of sovereign authority, . . . . governmental agencies,' and in the Byars case, 'the assurance against any revival of' the 'misuse of power in the matter of searches and seizures,' embodied in the 4th amendment, 'is not to be impaired by judicial sanction of equivocal methods . . . . which, in reality, strike at the substance of the constitutional right,' and as the same intention prompted the adoption of the provisions of our state constitution, 'to secure the people against unauthorized official action,' there seems no other logical conclusion than that unauthorized official action should not receive judicial sanction by receipt of evidence in a state court, although secured by federal officers, which, upon the same showing of facts, would be denied in a federal court, when to do so would be to violate the same right guaranteed by both the federal and state constitutions."

*Arregui,* 44 Idaho at 67, 254 P. at 796 (emphasis added).

Just recently the Washington Supreme Court in *State v. White,* 97 Wash.2d 92, 640 P.2d 1061 (1982) after observing its exhibited right to "interpret the Washington Constitution as more protective of individual rights than parallel provisions of the United States Constitution (citing cases)", went on to note that there was even earlier precedent for its decision in *White,* where it specifically declined to yield to the High Court's decision in *Michigan v. DeFillippo,* 443 U.S. 31, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979). The Washington Court said:

> "We think the language of our state constitutional provision constitutes a mandate that the right of privacy shall not be diminished by the judicial gloss of a selectively applied exclusionary remedy. In other words, the emphasis is on protecting personal rights rather than on curbing governmental actions. This view toward protecting individual rights as a paramount concern is reflected in a line of Washington Supreme Court cases predating *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, 84 A.L.R.2d 933 (1961), which first made the exclu-

690

sionary rule applicable to the states. *See State v. Cyr* 40 Wash.2d 840, 842, 246 P.2d 480 (1952); *State v. Miles,* 29 Wash.2d 921, 926, 190 P.2d 740 (1948); *State v. Gunkel,* 188 Wash. 528, 534–35, 63 P.2d 376 (1936); *State v. Buckley,* 145 Wash. 87, 258 P. 1030 (1927); *State v. Gibbons,* 118 Wash. 171, 182–88, 203 P. 390 (1922). The important place of the right to privacy in Const. art. 1, § 7 seems to us to require that whenever the right is unreasonably violated, the remedy must follow.

"*This reading is certainly not a novel one. In fact, the United States Supreme Court held the same view of the Fourth Amendment until recent decisions.* In *Mapp,* the exclusionary rule was declared binding on the states as a component of the Fourteenth Amendment due process clause. Justice Clark delivered the majority opinion, in which he wrote:

'The right to privacy, when conceded operatively enforceable against the States, was not susceptible of destruction by avulsion of the sanction upon which its protection and enjoyment had always been deemed dependent under the *Boyd, Weeks* and *Silverthorne* cases. Therefore, in extending the substantive protections of due process to all constitutionally unreasonable searches—state or federal—it was logically and constitutionally necessary that *the exclusion doctrine—an essential part of the right to privacy—be also insisted upon as an essential ingredient of the right newly recognized by the Wolf case.* In short, the admission of the new constitutional right by *Wolf* could not consistently tolerate denial of its most important constitutional privilege, namely, the exclusion of the evidence which an accused had been forced to give by reason of the unlawful seizure. *To hold otherwise is to grant the right but in reality to withhold its privilege and enjoyment.* Only last year the Court itself recognized that the purpose of the exclusionary rule "is to deter—to compel respect for the constitutional guaranty in the only

effectively available way—by removing the incentive to disregard it." *Elkins v. United States, supra,* [364 U.S. 206] at 217 [80 S.Ct. 1437 at 1444].'

(Italics ours.) *Mapp,* 367 U.S. at 655–56, 81 S.Ct. at 1691–92. The Court's current view of the exclusionary rule ignores the above language in *Mapp* without overruling it. *Mapp* stands as an anomaly in the court's current stance on the exclusionary rule. *Stone v. Powell,* 428 U.S. 465, 509, 96 S.Ct. 3037, 3059, 49 L.Ed.2d 1067 (1976) (Brennan, J., dissenting). *See generally* Burkhoff, *The Court that Devoured the Fourth Amendment: The Triumph of an Inconsistent Exclusionary Doctrine,* 58 Ore.L.Rev. 151 (1979).

"Without an immediate application of the exclusionary rule whenever an individual's right to privacy is unreasonably invaded, the protections of the Fourth Amendment and Const. art. 1, § 7 are seriously eroded. In our view, exclusion of the confession in this case is mandated by our state constitution. Such a rule will add stability to the rights of individual citizens, discourage the legislature from passing provisions akin to RCW 9A.76.020, and will make law enforcement more predictable. As summarized by Justice Clark:

'[W]e can no longer permit it [the right to privacy] to be revocable at the whim of any police officer who, in the name of law enforcement itself, chooses to suspend its enjoyment. Our decision, founded on reason and truth, gives to the individual no more than that which the Constitution guarantees him, to the police officer no less than that to which honest law enforcement is entitled, and, to the courts, that judicial integrity so necessary in the true administration of justice.'

*Mapp,* 367 U.S. at 660, 81 S.Ct. at 1694.

"The trial court's invalidation of RCW 9A.76.020(1) and (2) and its suppression of all evidence obtained as an incident to respondent's arrest under the above statute are affirmed."
640 P.2d at 1071–72.

All of which leads to the conviction that Idaho has long had its own statutory and case law which should be controlling the decision which this Court makes today. There are two ways to go. One is for this Court to remain a satellite in the eccentric orbiting of the High Court, and the other is to seek the consistency which is readily attainable by utilizing the teachings of the 120-year-old statutory provisions of the Idaho Code and *Arregui.* The question then becomes, absent the now discarded *Aguilar-Spinelli* test, and without embracing the newly adopted "totality of circumstances" (but at the same time not declaring it to have not been the rule in Idaho), whether the magistrate properly issued the instant search warrant. Initially, so it would seem clear to me, that the information of the anonymous tipster must be wholly disregarded. If the tipster had passed the same information directly into the ear of the magistrate, it would not make any difference whatever. And I much doubt that any magistrate would act upon such in any manner. That it comes to the magistrate through an officer serves to enhance its utility in no way whatever. In the hands of a police officer, however, if it excites the attention, it may certainly be enough to cause further investigation. And here there was further investigation which established the truth of some of which the tipster related. The officer by affidavit related to a magistrate what he personally knew, and properly let the magistrate draw the conclusions which might be gathered from the facts and allowable inferences. This was as the statutes require. The most that can be said from the facts properly stated is that the accused used an alias name in traveling to Orlando, Florida, and left his VW bug in long-term parking at the Boise airport. On that sparse statement of facts, the magistrate issued a warrant authorizing the search of defendant's person and baggage. If there is anything in the officer's affidavit which purports to declare that Orlando is a hot-bed of drug activity,[4] I am unable to find it. West Palm Beach (*Illinois v. Gates* ) and Orlando (this case), although both cities are in Florida, are poles apart. There are likely as many midwestern conservatives in Orlando as there are in Ames, Iowa, or Boise, Idaho. If not, or if the statement be thought of as facetious in nature, and while my belief may not be justified, it is no more outrageous than to infer that any person ticketed to Orlando is a prime drug suspect. The High Court majority in *Gates* was extremely careless in stigmatizing the whole state of Florida as a well-known drug source. This Court does likewise, heaping carelessness upon carelessness. At the same time there is nothing in this record to sustain a statement used by the *Gates* court that "Even standing alone, the facts obtained through the independent investigation of Mader and the DEA at least suggested that the Gates were involved in drug trafficking." 103 S.Ct. at 2320, 76 L.Ed.2d 534.

The conclusion is inescapable that the underlying facts properly before the magistrate fell far short of justifying a determination that probable cause was established. While it is true that "everything panned out well in the end" in this case, which is a plus, one can not dismiss from mind the countless invasions of individual freedom and privacy of innocent persons which may be occasioned by the majority's immediate and obeisant suppliance to *Gates,* without giving any due consideration to continuing with a rule which prior to *Aguilar-Spinelli* well implemented our Idaho Constitution. The rule of *Arregui* would better serve the magistrates of Idaho and better serve its people. To follow *Arregui* and continue to apply it to art. 1, § 13 would demonstrate that this Court is not without independence and not without its own integrity.

---

**4.** Orlando is not named by Justice Powell in *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), as a "source" city.