6 P.3d 815

STATE of Idaho, Plaintiff–Appellant–
Cross Respondent,

v.

Richard Dale CHEATHAM, Defendant–
Respondent–Cross Appellant.

State of Idaho, Plaintiff–Appellant–
Cross Respondent,

v.

Alicia Duyungan, Defendant–Respondent–
Cross Appellant.

Nos. 25504, 25570.

Supreme Court of Idaho,
Boise, February 2000 Term.

June 29, 2000.

567

Hon. Alan G. Lance, Attorney General, Boise, for appellant. Michael A. Henderson, Deputy Attorney General, argued.

Hutchinson, Lammers & Clark, Chtd., Twin Falls; Randy J. Stoker, Twin Falls, for respondent Richard Dale Cheatham. Randy J. Stoker argued.

Anthony M. Valdez, Twin Falls and John A. Olson, The Dalles, for respondent Alicia Duyungan. Anthony M. Valdez argued.

TROUT, Chief Justice.

The State of Idaho appeals from the district judge's grant of the defendants', Richard Cheatham (Cheatham) and Alicia Duyungan (Duyungan), motion to dismiss the felony murder charges filed against them. The State argues the district judge incorrectly interpreted Idaho law as it applied to this case and substantial evidence exists to support the charges of first degree murder in the commission of a robbery and, alternatively, first degree murder in the commission of burglary, as to both defendants. Because we find the district judge correctly determined the intent to commit the underlying felony must exist prior to the killing in order to be felony murder, we affirm this portion of the district judge's decision. However, we reverse his order dismissing the felony murder charges because sufficient evidence exists to support the charges of murder in the commission of a robbery or burglary. We also affirm the district judge's denial of Cheatham and Duyungan's motion to suppress evidence obtained pursuant to the search warrant issued for the residence in which they were residing, and Cheatham's motion to suppress statements made to law enforcement officers.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

On September 6, 1997, the body of Wayne Lafferty (Lafferty) was found in the Monument Peak area south of Twin Falls, Idaho. Lafferty's body was tightly wrapped in a blanket and tarp tied together with orange bailing twine. An autopsy performed by Dr. John Gray on September 7, 1997 revealed Lafferty had died as the result of craniocerebral trauma due to multiple blows to the back of his head. Lafferty's blood-alcohol concentration was found to be approaching .08.

Although Lafferty's body was discovered near Monument Peak, police believed Lafferty was killed in his residence due to the blood spatter evidence found at that location. According to a forensic blood spatter expert, the blood spatter evidence indicated Lafferty was moving across the room in an upright position as he was being struck from behind.

William Wright (Wright) was a neighbor and friend of Lafferty. In July 1997, Cheatham and Duyungan began living as guests in Wright's house. On Friday, September 5, 1997, Cheatham and Duyungan arrived at Wright's house with three videotapes. At 10:00 p.m., having watched one of the videotapes with Wright, Cheatham and Duyungan left the residence, telling Wright they were going to Lafferty's house to watch the remaining videos. Cheatham and Duyungan returned to Wright's residence at approximately 2:00 a.m. on September 6, 1997. On September 7, 1997, the police investigators interviewed Cheatham and Duyungan. While both denied any knowledge of the circumstances surrounding Lafferty's death,

they did acknowledge they had both had frequent contact with Lafferty in the months preceding his death. Later that same day, a search warrant was issued for Wright's residence. Pursuant to that search warrant, police investigators found a gold bracelet with the initials "W.L." and Lafferty's Costco card in an area of the house occupied by Cheatham and Duyungan.

In early December of 1997, Cheatham and Duyungan arrived at the residence of Cheatham's aunt, Margaret Lair (Lair), in Oklahoma City, Oklahoma. When they arrived, Cheatham had several items of gold jewelry in his possession, including a ring with diamonds, a large gold crucifix on a gold chain, and a Seiko watch. During the course of their stay, Cheatham persuaded Lair to pawn the gold ring with diamonds at an Oklahoma City pawnshop. Lair observed no jewelry in the possession of Duyungan.

At some point after the visit to Cheatham's aunt in Oklahoma, Cheatham and Duyungan arrived in Greenville, South Carolina. According to records obtained from a pawnshop in Greenville, a woman named Alicia Duyungan sold a bracelet to the business using a Washington state identification card to identify herself. Additional records from that same pawnshop indicate a man named Richard Cheatham pawned a gold cross using a Louisiana state driver's license as identification. Those items were subsequently recovered from the pawnshop.

At the preliminary hearing Wilma Lafferty, Wayne Lafferty's ex-wife, testified the jewelry recovered from the pawnshop was similar to jewelry owned by Lafferty (she could not identify any differences between the recovered jewelry and the jewelry owned by Lafferty). She also testified Lafferty had been wearing that jewelry on September 1, 1997, the last time she had seen Lafferty before his death.

On April 23, 1998, Cheatham and Duyungan were arrested in South Carolina for the theft of Lafferty's jewelry. Cheatham was interviewed by police in South Carolina and during the interview, Cheatham admitted

pawning the gold cross but maintained the cross was a present from his aunt, Margaret Lair. He denied any knowledge of Lafferty's death.

On May 11, 1998, Detective Curtis Gambrel and Deputy Nutting arrived in South Carolina to transport Cheatham back to Idaho. During the three-day trip back to Idaho, Cheatham indicated he wished to speak with Gambrel about Lafferty's death. On May 13, 1998, Detective Gambrel interviewed Cheatham in Rawlins, Wyoming. During this interview, Cheatham admitted involvement in Lafferty's death. Cheatham stated he had come to the aid of Duyungan who was being attacked by Lafferty. Cheatham further admitted to wrapping Lafferty's body up while still in the residence and using Lafferty's truck to dispose of the body. Cheatham also admitted to taking Lafferty's ring and gold chain and cross.

Following her arrest, Duyungan was also transported back to Idaho. While awaiting trial in the Twin Falls County jail, Duyungan told her cellmate she had struck a man with a hammer and "Richard" had finished the man. She said she had been defending herself from Lafferty who was trying to molest her. Duyungan also stated she had taken the man's jewelry and pawned it. Duyungan made similar admissions to two other inmates.

Cheatham and Duyungan were originally charged with premeditated first degree murder, and alternatively with two counts of first degree felony murder with robbery and burglary as the underlying felonies. Following the preliminary hearing, the magistrate judge dismissed the premeditated first degree murder charges, but bound Cheatham and Duyungan over on the felony murder charges.[1] Cheatham and Duyungan filed motions to dismiss the information for lack of sufficient evidence to bind them over for trial, which were denied. They then filed motions to reconsider, which were likewise denied.

1. Both Defendants were also bound over on two counts of grand theft, but those charges are not at issue in this appeal.

In August 1998, Cheatham and Duyungan each filed a motion to suppress evidence obtained pursuant to the September 7th search warrant, on the grounds the affidavit underlying the search warrant was, as a matter of law, insufficient to establish probable cause for issuance of the search warrant. The district judge denied these motions.

In October of 1998, Cheatham filed a motion to suppress certain statements made by him to law enforcement officers, on the grounds the statements were involuntary and that his *Miranda* rights were violated. The district judge granted the motion in part and denied it in part.

Finally, Cheatham and Duyungan renewed their motion to dismiss the information for insufficient evidence. After hearing argument and reviewing the evidence, the district judge granted the motion to dismiss the felony murder charges, thereby reducing the charges to second degree murder. The State has appealed this decision pursuant to Idaho Appellate Rule 11(c)(3) and (5). Cheatham and Duyungan have cross-appealed the district judge's denial of their motion to suppress evidence and Cheatham has cross-appealed the district judge's denial of his motion to suppress the statements he made to law enforcement officers.

## II.

## DISCUSSION

### A. The district judge erred in dismissing the felony murder charges.

#### 1. *Standard of Review.*

■ The trial judge granted the motion to dismiss the felony murder charges (and reduced the charges to second degree murder), just before the trial was scheduled to begin. The State argues this decision was essentially a grant of a motion for a judgment of acquittal as to the felony murder charges, pursuant to Rule 29 of the Idaho Criminal Rules. In contrast, Cheatham and Duyungan argue the motion was granted pursuant to I.C.R. 48(a)(2), allowing the judge to dismiss a criminal charge when such dismissal will "serve the ends of justice and the effective administration of the court's business."

Under I.C.R. 29, a trial judge may grant a motion for a judgment of acquittal after "the evidence on either side is closed." While the trial had not yet begun in this case, it is clear the trial judge considered the State's offer of proof of what the evidence would show at trial, and then used that as the basis for his ruling on the motion to dismiss. Neither party objected to this procedure. In examining the procedural posture of this case and the court's ruling, it appears the district judge was relying on I.C.R. 29.

■ When reviewing the district judge's grant of a motion for acquittal, we examine the record for sufficiency of the evidence supporting the trial court's determination. *See State v. Griffith,* 127 Idaho 8, 11, 896 P.2d 334, 337 (1995). We independently review the record to determine if there is no evidence upon which a guilty verdict could be based. *See id.*

#### 2. *The district judge correctly applied Idaho law to this case.*

■ While it is somewhat unclear from the district judge's oral decision, it appears he granted the motion to dismiss and reduced the charges based upon his determination that, in Idaho, a defendant cannot be convicted of felony murder if the intent to commit the felony was not formed prior to the commission of the homicide. In the district judge's view, because there was insufficient evidence to prove Cheatham and Duyungan formed the intent to steal prior to the homicide, the State could not proceed on the felony murder charges.

Although this is an issue of first impression in Idaho, the district judge's decision was based on the holdings of four Idaho cases. While none of these cases directly address the issue at hand, namely whether a killing committed prior to the formation of the intent to commit a felony can still be considered felony murder, the combination of three cases provides the framework for the decision below.

The first case relied upon by the district judge is *State v. Fetterly,* 109 Idaho 766, 710 P.2d 1202 (1985). In *Fetterly,* this Court faced the question of whether a killing com-

mitted after the completion of the felony could still be considered a murder in the commission of a felony for the purposes of the felony murder rule. Finding the defendant was properly charged with felony murder, the Court stated:

As the state points out in its brief, "The narrow construction Fetterly urges upon the Court would deprive [the felony murder rule] of any validity unless the victim was killed while the burglar had one leg over the windowsill or one foot across the threshold." We agree with the state's position. [The murder] was part of a stream of events which began the evening [the defendants] entered [the victim's] home and ended the following day when [the victim's] possessions were removed from the home.

*Fetterly,* 109 Idaho at 771–72, 710 P.2d at 1207–08. This same issue was addressed in *State v. Pratt,* 125 Idaho 546, 873 P.2d 800 (1993). In *Pratt,* we reaffirmed our holding from *Fetterly* and upheld a conviction for felony murder even though the killing took place after the felony was complete. In so holding, we noted:

In the present case, the trial court properly held that Brent Jacobson's death was also part of the stream of events which began when the Pratt brothers entered the residence of Louise Turner for the purpose of stealing money, were suddenly caught in the middle of the act by police officers, took a hostage to facilitate their escape, led the pursuing officers on a car and foot chase, and ended the following day when the Pratts finally surrendered to the pursuing police officers.

*Pratt,* 125 Idaho at 558, 873 P.2d at 812. While Idaho has adopted the "stream of events" rationale for felony murder, it is important to note the cases just discussed dealt only with situations where the *felony* was arguably complete prior to the commission of the homicide. In contrast, this case presents a situation where arguably the homicide was completed prior to the commission of the felony. Therefore, these cases are not dispositive.

The next case relied upon by the district judge is *State v. Belue,* 127 Idaho 464, 902

P.2d 489 (Ct.App.1995). In *Belue,* the issue before the Court of Appeals was whether a defendant could be convicted of robbery even though the evidence demonstrated that at the time the defendant attacked the victim, his only intent was to rape, not rob, her. Upholding the robbery conviction, the Court of Appeals stated:

It is immaterial whether the defendant harbored an intent to steal when the violence or intimidation occurred if, when taking the victim's possessions, the defendant knows that his violence or threats motivated the victim's surrender of the property.

*Belue,* 127 Idaho at 467, 902 P.2d at 492. The State argues, when taking the holding of this case to its logical conclusion, where the force applied causes death, a defendant could still be convicted of robbery even though he or she did not form the requisite intent to steal until after the killing occurred. The State's argument ignores the focus of the Court of Appeals in *Belue,* which was that a taking is still robbery regardless of when the intent is formed, as long as the defendant's force *motivated the victim's surrender of her property.* Where the force applied causes death, it is difficult to see how force could have motivated the victim to surrender the property, since the victim is dead. *Belue* does not provide support for the State's position that a robbery can be committed even if the intent to steal is not formed until after the killing occurs.

Even if *Belue* could be read as the State suggests, the district judge, citing *State v. Johns,* 112 Idaho 873, 736 P.2d 1327 (1987), properly recognized that a theft of property occurring after a homicide does not necessarily mean the murder and the theft are all part of the same indivisible conduct. Although *Johns* did not deal with a felony murder case, it did address an issue similar to the case at hand. In *Johns,* the defendant was convicted of murder and robbery. At sentencing, Johns received separate sentence enhancements for the use of a firearm during the commission of each crime. On appeal, Johns argued the separate sentence enhancements were improper because the acts resulting in the robbery and murder "arose out of the same indivisible course of conduct."

*Johns,* 112 Idaho at 882, 736 P.2d at 1336 (quoting I.C. § 19–2520E). This Court disagreed, holding the evidence in the record supported a finding that the conduct constituting the murder was divisible from the conduct constituting the robbery. In so holding, the Court stated:

> The statements and testimony at trial of both Julie Halverston and the defendant Johns clearly establish that the murder of Price was because of an ongoing long-standing hatred of Price by Johns.... It was only after Price had been mortally shot and stabbed, and after Johns had dragged him off to a hiding place in the sagebrush, that Johns, as an afterthought, determined to take Price's wallet and his Harley motorcycle. Upon returning to Kuna, Johns additionally entered Price's apartment and took more of his personal belongings. The trial court was amply justified in sentencing Johns upon the premise that the acts of murder and robbery were divisible, rather than indivisible.

*Id.* While *Johns* is not directly on point, the question of whether the robbery and murder constituted divisible conduct is quite similar to whether a robbery and murder were all part of the same general occurrence, as is required by the felony murder rule. Thus, the rationale applied in *Johns* also applies in this case. If the State cannot prove Cheatham and Duyungan intended to rob Lafferty by taking his property against his will prior to the commission of the homicide, then the homicide and the taking of Lafferty's property would not be part of the same general criminal occurrence and Cheatham and Duyungan could not be convicted of felony murder.[2] The district judge so ruled and to that extent we agree with the district judge's ruling. As indicated in the next section of this opinion, we disagree with the district judge's determination that there was not sufficient evidence that the robbery and murder were one indivisible act so that the jury could at least consider whether the felony murder charge has been proved.

We also note that our holding that the intent to steal must be formed before the murder occurs, is consistent with the underlying rationale of the felony murder rule. In *State v. Lankford,* 116 Idaho 860, 781 P.2d 197 (1989), this Court, in discussing the felony murder rule, noted Idaho's homicide statutes define murder as the unlawful killing of a human being with malice aforethought. Under the felony murder rule, the fact the homicide occurred during the commission of a felony supplies the malice element for a murder conviction. *See id.* at 867, 781 P.2d at 204. The general rationale behind the felony murder rule is that the intent to commit the felony substitutes for the malice requirement. Where the intent to commit the felony does not arise until after the homicide has occurred, the rationale behind the rule no longer applies. *See* LAFAVE & SCOTT, CRIMINAL LAW, § 7.5, p. 228 (1986).

### 3. *Substantial and competent evidence exists to support the felony murder charges.*

Because felony murder can occur only when the intent to commit the felony exists prior to the commission of the homicide as part of one indivisible act, we must next decide whether the district judge properly determined the State lacked sufficient evidence to support a charge of felony murder in this case.

 Applying this standard to the facts of this case, as well as the law as set forth above, we hold the trial judge incorrectly granted the motion to dismiss the felony murder charges and improperly reduced those charges to second degree murder as to both defendants. In order to be convicted of felony murder, with robbery as the underlying felony, the State must prove the defendants committed a murder in the perpetration of, or attempt to perpetrate a robbery. *See* I.C. § 18–4003(d). After Cheatham's arrest, he admitted striking Lafferty, and that those blows led to Lafferty's death. Similarly, Duyungan made statements to fellow in-

---

**2.** Although the Court affirmed John's robbery conviction, it does not appear that Johns ever appealed the issue of whether he could have been properly convicted of robbery when the intent to steal was not formed until after the homicide occurred. Therefore the Court in *Johns* never specifically addressed that issue.

mates at the Twin Falls County jail in which she admitted she struck Lafferty with a hammer. The evidence at the crime scene reveals Lafferty was killed by numerous blows to the back of the head. The State also presented evidence showing Lafferty wore various pieces of jewelry and the defendants were aware Lafferty owned the jewelry. Both Cheatham and Duyungan also made statements in which they admitted taking some of Lafferty's jewelry after Lafferty was killed. Additionally, the records from the South Carolina pawnshop and the testimony of Wilma Lafferty support a finding that Cheatham and Duyungan took Lafferty's jewelry with the intent to permanently deprive him of it. The only question is whether the State has made a sufficient showing that the killing occurred during the commission of the robbery.

As discussed above, to be considered a murder in the perpetration of a robbery, the State must show Cheatham and Duyungan formed the intent to steal prior to the time Lafferty was killed. In this case, both Cheatham and Duyungan argue the State has failed to present any direct evidence Cheatham and Duyungan formed the intent to rob Lafferty prior to the murder. We have previously held "[s]pecific intent may, and ordinarily must, be proved by circumstantial evidence." *State v. Oldham*, 92 Idaho 124, 132, 438 P.2d 275, 283 (1968). Additionally, we have held "[o]ne's intent may be proved by his acts and conduct, and such is the usual and customary mode of proving intent." *Id.* (quoting *Ex parte Seyfried*, 74 Idaho 467, 470, 264 P.2d 685 (1953)). The fact the State has not presented direct evidence of Cheatham and Duyungan's intent does not render its case fatally flawed.

All of the evidence outlined above is sufficient circumstantial evidence of Cheatham and Duyungan's intent to rob Lafferty prior to the murder. From these facts it can be inferred that Cheatham and Duyungan attacked the older and frailer Lafferty from behind with the intent to take his property and then dumped the body in order to cover up the crime. While the defense argues the evidence supports a different theory of the crime, we cannot say the State has presented "no evidence upon which a conviction can be based." Therefore, we reverse the trial court's decision and allow the State to proceed on its theory of felony murder with robbery as the underlying felony.

Similarly, we hold the State has presented sufficient evidence to support its theory of felony murder with burglary as the underlying felony. Under I.C. § 18–1401, in order to prove burglary, the State must prove Cheatham and Duyungan entered Lafferty's residence with the intent to commit a felony. As with the crime of robbery, the defendants' specific intent to commit a felony can be proven by circumstantial evidence. Here, the State has presented circumstantial evidence as outlined above which supports the allegation that Cheatham and Duyungan intended to commit a theft or robbery at the time they entered Lafferty's residence. Again, while the defendants argue the evidence supports a different theory of the crime, we cannot say the State has presented "no evidence" upon which a conviction can be based. Therefore, we reverse the district judge's decision and allow the State to proceed on its theory of felony murder with burglary as the underlying felony.

**B. The district judge properly denied the defendants' motion to suppress evidence obtained pursuant to the search warrant.**

1. *Standard of Review.*

When determining the validity of a search warrant "[t]he task of the issuing [judge] is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332–33, 76 L.Ed.2d 527, 548 (1983); *see also State v. Lang*, 105 Idaho 683, 684, 672 P.2d 561, 562 (1983). When probable cause to issue a search warrant is questioned on appeal, this Court's function is to ensure the judge had a substantial basis for concluding probable cause existed. *See Gates*, 462 U.S. at 239, 103 S.Ct. at 2332–33, 76 L.Ed.2d at 548; *Lang*, 105 Idaho at 684, 672 P.2d at 562. In

this evaluation, great deference is paid to the judge's determination. *See Gates,* 462 U.S. at 236, 103 S.Ct. at 2331, 76 L.Ed.2d at 546; *State v. Josephson,* 123 Idaho 790, 792, 852 P.2d 1387, 1389 (1993).

### 2. *Discussion.*

■ In applying the above standard to the affidavit of probable cause in this case, we review the probable cause determination based only on the facts properly before the judge at the time of his decision, even though it is acknowledged there is a typographical error in the affidavit. *See Josephson,* 123 Idaho at 792, 852 P.2d at 1389. The dates set forth in the affidavit are taken at face value in determining whether sufficient probable cause existed to support the issuance of the search warrant.

■ In the affidavit, Detective Stuart Robinson outlines the course of his investigation of the murder. On July 6, 1997, [September 6, 1997] he was led to the body of a man later identified as Wayne Lafferty. During his investigation of the scene he discovered numerous white hairs on the body and hands of the victim which did not appear to match the hair of the victim and, therefore, Detective Robinson concluded the hair was from the suspect. On July 7, 1997, [September 7, 1997] Robinson observed the autopsy and was told the victim died from several blows to the back of the head. Robinson then executed a search warrant on Lafferty's residence and that search revealed that Lafferty's residence was the scene of the homicide. On the same day Wilma Lafferty, the victim's ex-wife, upon learning of Lafferty's death, encouraged officers to investigate a man named "Rick" who frequented the residence and who would be in the company of his girlfriend "Nicole." Further investigation revealed a Richard Cheatham lived in a residence across from Mr. Lafferty's residence.

Detective Robinson then went to the residence and spoke with Wright, the owner of the residence who told him Rick and Nicole resided there and that Rick frequently visited Lafferty. Wright told him that on the evening of September 6, 1997, Richard Cheatham returned home and took a shower at about 10:30 p.m. which was unusual for him to do. After Cheatham showered, he cut and dyed his hair. Although it not entirely clear, it appears the conversation with Wright took place on September 7, 1997, the date on which the application for the search warrant was made.

Detective Robinson then related a later conversation with Wright in which Wright asked Robinson to look for a .22 Colt pistol hidden in a chair and referred to a holster hanging on the wall by the television. When Detective Robinson responded that he had found the holster but there was no pistol in it nor was it hidden in the chair, Wright stated that the pistol was kept in the chair and only Wright and Cheatham knew the location of the pistol.

Wright later gave permission for a search of the contents of his garbage located on the back porch. This search turned up numerous white hairs, two check copies from Lafferty and a pair of blue denim pants with what appeared to be blood on the pant leg. It was Detective Robinson's opinion, in light of the amount of blood on the floor and walls of Lafferty's residence, the suspect likely would have gotten blood on his or her clothing.

Analyzing the affidavit in light of the standards set forth above, we hold the district judge properly denied the defendants' motion to suppress. As to the "missing" gun, there is a reasonable basis for believing Wright was familiar with Lafferty's residence and would know where Lafferty kept his gun and who had knowledge of its whereabouts. While the defendants correctly point out there is no allegation Lafferty had been shot, there is testimony that Lafferty died from several blows to the back of the head and it is conceivable the butt of a pistol could have caused those wounds. Therefore, while the information concerning the missing gun may not be entitled to great weight, it also should not be discounted entirely.

■ The biggest problem with the affidavit is the apparent two-month time lapse between the discovery of the body and the discovery of the white hairs and jeans in Wright's trash. Cheatham and Duyungan

argue the discovery of white hairs and blood stained jeans in the trash some two months after the murder cannot provide support for the issuance of the warrant, particularly because there is no information in the warrant suggesting the white hairs matched those found on the body, or the "apparent blood" on the jeans had been tested. Given the fact that the items had only been found that day, the lack of testing is clearly understandable. Additionally, the affidavit states the items were found in the trash on the back porch, a place where one conceivably would keep a trash bin and empty it only when full. The fact the items were found two months after the murder does not mean they could not have been placed in the trash at the time of the murder. While the two-month time lapse between the murder and the discovery of the white hairs and jeans may lessen their weight somewhat, it does not render this evidence stale or inconsequential.

Applying the totality of the circumstances test to the affidavit, the information contained in the affidavit does provide substantial basis for finding probable cause. The information demonstrates Cheatham and Duyungan knew Lafferty and were frequent visitors at his residence; that, due to the blood spatter evidence, Lafferty's residence was the apparent scene of his homicide; that Lafferty's ex-wife suggested that the police should investigate "Rick" and "Nicole"; that Cheatham had recently cut and dyed his hair; that there was a missing gun and Cheatham apparently knew where the gun was kept; that white hairs had been found on the body; and that white hairs and jeans with what appeared to be blood were found in the trash of the residence where Cheatham and Duyungan were staying. The affidavit contains sufficient evidence to support a finding of probable cause to believe Cheatham and Duyungan were connected to Lafferty's death and fruits or instrumentalities of the crime could be discovered in Wright's residence. We affirm the district judge's denial of Cheatham and Duyungan's motion to suppress evidence found pursuant to the search warrant.

## C. The district judge properly denied Cheatham's motion to suppress his statements made to law enforcement officers.

### 1. Standard of Review,

When reviewing a trial judge's ruling on a defendant's motion to suppress, this Court defers to the trial court's factual findings unless they are clearly erroneous. *State v. Medley,* 127 Idaho 182, 185, 898 P.2d 1093, 1096 (1995). Based upon the trial court's findings, this Court exercises free review over whether the constitutional requirements have been met. *See id.*

### 2. Discussion.

In the trial court below, Cheatham filed a motion to suppress the statements he made to Detective Gambrel during the interview in Rawlins, Wyoming on the grounds the statements were obtained in violation of his *Miranda* rights. Cheatham argues that Detective Gambrel initiated the discussion of the incident and engaged in a course of conduct amounting to interrogation prior to Cheatham's waiver of his previously invoked *Miranda* rights. In his brief, Cheatham does not dispute the district judge's determination that Detective Gambrel did not question Cheatham during the trip and the incident was never discussed until Cheatham indicated he wished to talk to Detective Gambrel. Therefore, we will not address this aspect of the suppression motion.

It is undisputed Cheatham had invoked his right to counsel while in custody in South Carolina and both Detective Gambrel and Deputy Nutting were aware of this. It is well accepted that when an accused person in custody has invoked his right to counsel under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), that person is not to be subjected to further interrogation until counsel has been made available to him, unless he waives his earlier request for counsel and himself initiates any dialogue. *Edwards v. Arizona,* 451 U.S. 477, 485–86, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378, 386–87 (1981); *State v. Kysar,* 116 Idaho 992, 996, 783 P.2d 859, 863 (1989). Any responses to further interrogation are admissible only

when it is shown by a preponderance of the evidence the accused initiated further discussions and he knowingly and intelligently waived his right to counsel which he earlier invoked. *Smith v. Illinois*, 469 U.S. 91, 95, 105 S.Ct. 490, 493, 83 L.Ed.2d 488, 493 (1984); *Kysar*, 116 Idaho at 996, 783 P.2d at 863. Interrogation includes not just words, but also conduct that is reasonably and likely to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297, 308 (1980).

Cheatham argues that, during the course of the trip from South Carolina to Idaho, Detective Gambrel and Deputy Nutting engaged in a course of conduct which was designed to elicit an incriminating statement from Cheatham, thereby violating his previously invoked right to counsel, and rendering any subsequent waiver of that right involuntary. In support of this argument, Cheatham points to his own version of the events which he believes the district judge should have relied on. Cheatham asserts that Detective Gambrel engaged Cheatham in casual conversation concerning family (specifically Cheatham's mother), jobs, and religion (including discussions about sermons on the radio, and Christian music). Cheatham points out Detective Gambrel admittedly observed Cheatham's declining mental and physical condition, and argues Detective Gambrel used this as a basis for encouraging Cheatham to talk. Finally, he argues the entire trip from South Carolina to Idaho was deliberately designed to give the police an opportunity to confront Cheatham without his counsel present.

In contrast to Cheatham's version of events, the district judge expressly found Detective Gambrel's testimony concerning the events of the trip credible. Specifically, the district judge found: (1) during the course of the three day trip, Detective Gambrel engaged Cheatham in casual conversation; (2) the Christian music and sermons were interspersed with secular music; (3) Cheatham was consulted as to what type of programs he wanted to listen to; (4) Cheatham was never threatened by the officers; (5) that on the morning of the third day of the trip, Detective Gambrel commented

Cheatham was looking better; (6) the events surrounding Lafferty's death were not discussed until Cheatham indicated he wished to speak with Detective Gambrel; (7) Detective Gambrel read Cheatham his *Miranda* rights prior to questioning him and Cheatham indicated he understood those rights and was waiving them in order to speak with Detective Gambrel; and (8) Cheatham indicated the reason he decided to talk was because he had promised his mother he would. Because these facts are based on substantial and competent, albeit conflicting, evidence, they will not be overturned on appeal. *See Kysar*, 116 Idaho at 998 n. 2, 783 P.2d at 865 n. 2.

The conduct of the officers during the trip from South Carolina to Idaho did not amount to coercive tactics designed to elicit incriminating statements from Cheatham, and therefore cannot be considered improper interrogation; nor were those actions of such a coercive nature as to render Cheatham's subsequent confession involuntary. Rather, the evidence, including Cheatham's own statements, indicates the reason Cheatham decided to talk to the officers was because he had made a promise to his mother prior to the time the officers arrived in South Carolina. Cheatham has presented no evidence to indicate he did not clearly understand his rights as read to him by Detective Gambrel prior to any questioning in Rawlins. We uphold the district judge's determination that Cheatham knowingly, intelligently, and voluntarily waived all of his previously invoked *Miranda* rights, including his right to have counsel present during questioning and affirm the denial of Cheatham's motion to suppress.

## III.

## CONCLUSION

Based on the foregoing discussion, we reverse the district judge's order reducing the felony murder charges to second degree murder. Although the district judge correctly determined the intent to commit the underlying felony must exist prior to the homicide, the State has presented sufficient evidence to support submitting the issue to a jury. We affirm the district judge's denial of Cheatham and Duyungan's motion to sup-

press evidence seized pursuant to the search warrant. Finally, we affirm the district judge's denial of Cheatham's motion to suppress statements because there is evidence that Cheatham initiated the discussion of Lafferty's death and made a knowing and intelligent waiver of his rights.

Justices SILAK, SCHROEDER, WALTERS and KIDWELL, concur.