**IN THE SUPREME COURT OF THE STATE OF IDAHO**
**Docket No. 50700**

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | Lewiston, April 2025 Term |
| | ) | |
| v. | ) | Opinion Filed: July 17, 2025 |
| | ) | |
| DEMETRI X. EWING, | ) | Melanie Gagnepain, Clerk |
| | ) | |
| Defendant-Appellant | ) | |
| | ) | |

Appeal from the District Court of the Second Judicial District of the State of Idaho, Nez Perce. Jay P. Gaskill, District Judge.

The district court's judgment of conviction is <u>affirmed</u>.

Silvey Law Office, Ltd., Boise, attorneys for Appellant. Greg Silvey argued.

Raúl R. Labrador, Idaho Attorney General, Boise, attorneys for Respondent. Mark Olson argued.

_____

BEVAN, Chief Justice.

Demetri X. Ewing appeals from his judgment of conviction for first-degree felony murder, committed during the perpetration or attempted perpetration of a robbery and/or burglary. Demetri raises two challenges on appeal, alleging the district court erred in: (1) denying his motions to suppress and for a *Franks*[1] hearing; and (2) admitting statements from the decedent's mother in violation of the Confrontation Clause and *Crawford v. Washington*, 541 U.S. 36 (2004). For the reasons below, we affirm the judgment of conviction.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. Factual Background

In the early morning hours of January 8, 2021, two people dressed in black entered Samuel Johns' residence through the kitchen door. Patrycia Labombard, a visitor to the house, saw the two

---

[1] *Franks v. Delaware*, 438 U.S. 154 (1978).

[2] The factual background in this appeal is identical to the factual background in the companion appeal, *State v. Ewing*, Docket No. 50452. However, because the cases were severed before trial, the procedural histories are distinct.

1

assailants enter, and she testified that one of them was armed with a handgun. She described one of the assailants as a teenaged girl or young woman. Labombard stated that one assailant tried to restrain her with a zip tie while the other assailant went further into Johns' residence. Labombard told police that the assailant who restrained her was "about six inches taller than her." Labombard slipped out of the zip ties and then hid in the bathroom with the door shut. She described hearing a fight, yelling, shouting, and then gunshots in the other room.

Labombard then heard the assailants leave out the kitchen door. After the assailants left, Labombard went to the living room and saw Johns lying on the floor with gunshot wounds. There were seven other people in the house, though none reportedly witnessed the shooting. Johns died from his injuries.

That evening, officers began to interview the seven other people who were in the house at the time of the shooting, including Debra Moffat, Johns' mother. Police interviewed Johns' friends and family, who told police that they believed the two people who had shot Johns were 42-year-old Clyde Ewing and 16-year-old Demetri Ewing, Clyde's son. This belief was based on an on-going dispute over a stolen pistol, belonging to Clyde's brother, Christopher Higheagle, and a stolen backpack. Police later interviewed Christopher and Virginia Higheagle, Clyde's brother and sister. Virginia reported to police that her family believed Clyde and Demetri had killed Johns, noting that Clyde had been causing problems in the family. Virginia also believed that Clyde had broken into her and Christopher's residence to steal the pistol and backpack. Virginia informed police that Clyde and Demetri were staying at the nearby Hacienda Lodge in Clarkston, Washington, where she had seen two black bicycles in the room.

Police secured a search warrant for Johns' residence and began recovering physical evidence from the scene, and collecting surveillance videos from cameras in the area. Among the scenes discovered on the video surveillance were footage of two individuals, dressed in black, riding mountain bikes near Johns' house the night he was murdered.

On January 12, 2021, Clyde and Demetri were arrested without a warrant in Clarkston, Washington. Law enforcement subsequently obtained a search warrant for Clyde's and Demetri's room at the Hacienda Lodge, and they seized several items, including a black backpack with a spent aluminum 9 mm bullet casing at the bottom of it. Police also located black zip ties, electrical and duct tape, black clothing, including black sweatshirts, and black mountain bikes. On January

13, 2021, Lewiston police subsequently sought and obtained an Idaho arrest warrant for Clyde and Demetri.

## B. Procedural History

Following their arrest, both Demetri and Clyde were charged with first-degree felony murder. Each was appointed separate counsel. Although Clyde moved to sever the cases, Clyde's and Demetri's cases were initially joined for trial. On August 25, 2021, Demetri filed a motion to suppress the evidence that was recovered pursuant to the search and arrest warrants, contending that neither warrant was supported by probable cause. Demetri also argued that the State's search warrant affidavit contained material omissions, which warranted a hearing under *Franks v. Delaware*, 428 U.S. 154 (1978). After a hearing on Demetri's motion, the district court denied it.

Moffat died before trial. Before Demetri's April trial, the State filed a motion in limine to admit a recorded police interview with Moffat, arguing that her statements were admissible under Idaho Rules of Evidence 803(24) and 804(b)(6). In supplemental briefing, the State clarified that it sought to introduce only the video interview between Moffat and Detective Joe Stormes, where Moffat testified to what she heard during the shooting. Demetri did not file a written objection to the State's motion but, during a joint hearing with Clyde, opposed the State's motion on hearsay grounds. Following oral arguments, the district court granted the State's motion in limine to admit the video interview.

Before trial, Demetri and Clyde filed renewed motions to sever their cases, which the district court granted on March 17, 2022. Demetri was ultimately found guilty of first-degree felony murder and sentenced to life in prison, with 25 years fixed. Demetri appeals.

## II.     ISSUES ON APPEAL

1.     Did the district court err by denying Demetri's motion to suppress?
2.     Did the district court err by allowing hearsay statements from Johns' mother?

## III.     STANDARDS OF REVIEW

In reviewing a trial court's order granting or denying a motion to suppress evidence, the standard of review is bifurcated. *State v. Draper*, 151 Idaho 576, 592, 261 P.3d 853, 869 (2011) (citing *State v. Watts*, 142 Idaho 230, 232, 127 P.3d 133, 135 (2005)). This Court will accept the trial court's findings of fact unless they are clearly erroneous. *Id*. (citing *State v. Diaz*, 144 Idaho 300, 302, 160 P.3d 739, 741 (2007)). That said, this Court freely reviews the trial court's

3

application of constitutional principles considering the facts found. *State v. Samuel*, 165 Idaho 746, 762, 452 P.3d 768, 784 (2019).

"When reviewing the trial court's evidentiary rulings, this Court applies an abuse of discretion standard." *State v. Smalley*, 164 Idaho 780, 783, 435 P.3d 1100, 1103 (2019) (citation omitted). Under the standard, this Court conducts its review by considering four essentials: "'whether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason.'" *State v. Bodenbach*, 165 Idaho 577, 591, 448 P.3d 1005, 1019 (2019) (quoting *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018)).

The Confrontation Clause of the Sixth Amendment gives a criminal defendant the right "to be confronted with the witnesses against him[.]" U.S. CONST. amend. VI. "Whether admission of evidence violates a defendant's right to confront adverse witnesses under the Sixth Amendment's Confrontation Clause is a question of law over which this Court exercises free review." *State v. Stanfield*, 158 Idaho 327, 331, 347 P.3d 175, 179 (2015).

## IV. ANALYSIS

### A. The district court did not err by denying Demetri's motion to suppress.

Demetri first maintains there was no probable cause to support a warrant or warrantless arrest because the "only eyewitness to the intruders . . . was Patricia [sic] Labombard[,]" who believed that one intruder was female. For the reasons below, the district court's decision to deny Demetri's motion to suppress is affirmed.

1. *The evidence presented to the magistrate court was more than sufficient to establish probable cause for the search and arrest warrants.*

"For an arrest to be considered lawful, it must be based on probable cause." *State v. Bishop*, 146 Idaho 804, 816, 203 P.3d 1203, 1215 (2009) (citation omitted).

> Our standard for determining probable cause for an arrest is low. *See State v. Neal*, 155 Idaho 484, 486–87, 314 P.3d 166, 168–69 (2013). Probable cause requires "less than a preponderance of the evidence," *id.* at 487, 314 P.3d at 169, and is based on "the factual and practical considerations of everyday life on which reasonable and prudent [persons], not legal technicians, act." *State v. Julian*, 129 Idaho 133, 136, 922 P.2d 1059, 1062 (1996) (alteration in original) (citation omitted). An arrest is supported by probable cause when it is based on information that "would lead a man of ordinary care and prudence to believe or entertain an honest and strong suspicion that such person is guilty." *Weber*, 116 Idaho at 452, 776 P.2d at 461

4

(quoting *State v. Alger*, 100 Idaho 675, 677, 603 P.2d 1009, 1011 (1979)). "[T]he facts making up a probable cause determination are viewed from an objective standpoint[.]" *State v. Amstutz*, 169 Idaho 144, 150, 492 P.3d 1103, 1109 (2021). Probable cause for an arrest lies in the totality of the circumstances known to the officer at the time of arrest.

*State v. Smith*, ___ Idaho ___, ___, 569 P.3d 137, 144 (2025).

A reviewing court must evaluate whether the totality of circumstances, known to officers at the time of the arrest, is sufficient to establish probable cause. *See Illinois v. Gates*, 462 U.S. 213, 238, (1983). Thus, "[i]n reviewing a determination of probable cause, [this Court] look[s] at the warrant affidavit (transcript) submitted to the magistrate to determine whether it provided the magistrate with a substantial basis for concluding that probable cause existed." *State v. Yager*, 139 Idaho 680, 686, 85 P.3d 656, 662 (2004) (citing *Gates*, 462 U.S. at 239; *State v. Lang*, 105 Idaho 683, 684, 672 P.2d 561, 562 (1983)). "Probable cause is determined by the magistrate from the facts set forth in the affidavits and from recorded testimony in support of the application for the warrant." *Id.* (citing *State v. Hagedorn*, 129 Idaho 155, 922 P.2d 1081 (Ct. App. 1996)). The determination is based on a "totality of the circumstances" test. *Id.* (citing U.S. CONST. amend. IV).

"Probable cause to search requires a nexus between criminal activity and the item to be seized, and a nexus between the item to be seized and the place to be searched." *Id.* (citing U.S. CONST. amend. IV). "Most courts require that a nexus between the items to be seized and the place to be searched must be established by specific facts; an officer's general conclusions are not enough." *Id.* (citations omitted). Magistrate courts are "entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense." *Yager*, 139 Idaho at 686, 85 P.3d at 662.

A court's determination of probable cause is accorded great deference. *State v. Lang*, 105 Idaho 683, 684, 672 P.2d 561, 562 (1983). The United States Supreme Court has explained:

> [A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review. A magistrate's determination of probable cause should be paid great deference by reviewing courts. A grudging or negative attitude by reviewing courts toward warrants is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; courts should not invalidate warrants by interpreting affidavits in a hypertechnical, rather than a commonsense, manner.

*Gates*, 462 U.S. at 236 (citation modified).

5

The standards that apply to assess the legality of search warrants and arrest warrants are distinct. For that reason, the district court provided separate analyses to evaluate whether there was probable cause to support each warrant. In the district court's opinion and order denying Demetri's motion to suppress, the district court first found that the magistrate court had sufficient probable cause to issue a search warrant:

> A review of the facts presented to [the judge] in this case establishes there were sufficient facts upon which the judge could find probable cause to issue the search warrant. As discussed above, the [d]efendants challenge the reliability of the statements of family members; however, when considering the totality of the information presented to [the magistrate court], there was probable cause that evidence of the crime would be found at the Hacienda Motor Lodge Room 126. Here, any doubts are properly resolved in favor of the warrant.

The court also discussed its finding that probable cause supported the arrest:

> At the time of the first arrest of the defendants, there had been sufficient investigation to establish probable cause supporting the arrest of the Ewings for the crimes charged. The [d]efendants were connected to the victim through interviews with family members, as well as the gathering of video evidence showing bicyclists and bicycle tracks near the scene of the crime and also near the Ewings motel room. The officers had gathered information to know that the Ewings traveled by bicycle, and that the Ewings were residing at the Hacienda Lodge Motel. Considering the totality of the facts known to the officers, there was probable cause to make the arrests on January 12, 2021.

While the district court analyzed the warrants independently, Demetri couples his argument, challenging both warrants with a cursory assertion that there was

> not probable cause to arrest Demetri, with or without a warrant, . . . because he is not a girl. For that same reason, it does not establish probable cause to search the motel room of Clyde and Demetri because the people who burst [into Johns' residence] were a man and a girl and Clyde and Demetri are not a man and a girl.

Demetri's argument focuses on the testimony from one person, Labombard, rather than on the totality of all evidence before the judge who issued the warrants. Demetri maintains that "[w]hatever supposed probable cause that [family interviews and the surveillance tapes] developed is handily undone by the irreconcilable and unchallenged fact that Demetri does not begin to meet the only eyewitness' description." Demetri also argues that the warrant applications "do nothing to controvert" Labombard's identification. We disagree.

The evidence presented to the magistrate court contained more than sufficient evidence to justify the search warrant. This evidence can be summarized into these categories: (1) a description of the murder scene, including the physical evidence collected there and witness accounts; (2)

6

Christopher Higheagle's report of the theft of a pistol from his residence shortly before the shooting; (3) the Johns and Ewing family members' reported suspicions that Clyde and Demitri committed the murder because of the purported theft of their property; (4) that the Ewings resided in the Hacienda Lodge in Clarkston, Washington, that was the subject of the search warrant; and (5) a collection of surveillance videos from various sources between the scene of the shooting and the Ewings' motel room, collectively showing two individuals on bikes at relevant locations around the time of the murder.

The supporting affidavit's description of the immediate aftermath of the murder scene left no doubt that two intruders entered a Lewiston residence and participated in the killing of Johns. The affiant was familiar with the Ewings and personally knew that they had been staying in Room 126 at the Hacienda Lodge for an extended period. The Ewings' residency at the motel was also corroborated by Virginia Higheagle. The remaining facts presented in the affidavit connected the Ewings and their residence with the murder. Two spent 9mm shell casings were found at the murder scene, and Christopher Higheagle reported that his 9mm pistol had been stolen from his Lewiston residence five days before the murder. Christopher suspected Clyde of stealing the pistol.

Detectives also found zip ties that were fashioned into a restraint near the bathroom door of Johns' residence. Labombard, who was at the residence when the murder was committed, reported that one of the intruders attempted to restrain her with zip ties. Outside the residence, detectives located shoe prints on a pathway beside an alley. On that pathway, detectives also discovered more zip ties fashioned into restraints with black tape. As detectives continued to search, they uncovered more shoe prints and what they believed were two sets of bicycle tracks along the 1700 block of 8th Avenue (near the location of Johns' residence) leading west toward 16th Street. Virginia Higheagle reported that the Ewings had been riding stolen bicycles that were spraypainted black, and that she saw the bikes in the Ewings' Clarkston motel room.

The evidence about the bikes, the bike tracks heading west, and zip ties found near the bike tracks, was particularly significant once combined with a collection of surveillance videos officers obtained from several sources near both Johns' residence and the Ewings' Clarkston motel room. These videos included: (1) footage taken from Hacienda Lodge surveillance cameras showing two individuals on bikes, wearing dark clothing, leaving the area of room 126 of the motel and heading west (toward Johns' residence) just after midnight on January 8, 2021, shortly before the murder; (2) footage taken from security cameras at two residences showing two individuals on bikes,

wearing dark clothing, near Johns' residence and heading north and west shortly after the murder; (3) audio footage from security cameras at another residence near Johns' residence depicting gunshots; a rustling that sounded like people running; and then a faint, higher-pitched voice saying, "I" or "You," "shot him Dad."

Law enforcement interviewed Johns' family and friends and Clyde's and Demetri's family. The affiant reported that members of both the Johns and the Ewing families suspected the Ewings in the murder, and that Clyde and Demetri were upset over a purportedly stolen backpack that they believed was at 1706 7th Ave in Lewiston—Johns' residence. Virginia recounted an ongoing dispute between Clyde and their family over the missing backpack. Virginia also told police that she believed Clyde broke into her and Christopher's residence and stole Christopher's pistol and the black backpack. Virginia said the backpack contained $700 in items, including a first aid kit, throwing knives, a hatchet, electrical tape, and zip ties.

The facts within the search warrant application showed a nexus between Johns' murder and the evidence seized from Clyde and Demetri's motel room. The officer was personally familiar with Demetri and had personal knowledge that he was staying at the Hacienda Lodge. That information was further corroborated by Virginia. The surveillance videos supported the physical evidence that detectives had uncovered. The magistrate court's determination that this evidence created a sufficient nexus is entitled to deference, and Demetri has not overcome that standard. *Lang*, 105 Idaho at 684, 672 P.2d at 562.

There was also sufficient evidence to support both of Demetri's arrests. The Washington officers' warrantless arrest of Demitri was conducted on the same date as the search of the motel room and, thus, was nearly contemporaneous with the granting of the search warrant. For all the same reasons discussed above with respect to why the search warrant affidavit contained sufficient evidence to justify the search warrant, the Washington officers also had probable cause to arrest Demitri.

After the search warrant was executed, the State had even more evidence of Demetri's role in the murder of Johns. This additional evidence, as summarized in the Idaho authorities' arrest warrant application and affidavit, included the discovery of a spent 9mm casing in the bottom of a backpack, which was consistent with the ammunition found at the scene of the homicide; tape and zip ties, consistent with those found at the scene of the homicide; black clothing; spray paint; and two mountain bikes, consistent with the bikes observed in the surveillance videos. Based on the

totality of circumstances, this evidence, coupled with the evidence known to the police before the search warrant was issued, constituted sufficient probable cause for the magistrate court to issue an arrest warrant. Demetri's argument to the contrary turns entirely on the conflicting testimony presented by Labombard about the identification of one of the intruders. But for probable cause purposes, that testimony is not enough to overcome the totality of all the other evidence presented to the magistrate court. "Probable cause is a flexible common-sense standard," requiring only a practical, nontechnical probability that incriminating evidence is present. *State v. Anderson*, 154 Idaho 703, 706, 302 P.3d 328, 331 (2012). Further, probable cause "deal[s] with probabilities. These [determinations] are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent [persons], not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175 (1949). When considered in total, there was more than enough evidence for the magistrate court to find there was probable cause to issue an arrest warrant.

2. *Demetri was not entitled to a* Franks *hearing.*

On appeal, Demetri now argues, citing much more detailed allegations than were ever mentioned below, that the district court erred in denying him a *Franks* hearing because the police intentionally or recklessly omitted exculpatory information from the warrant applications and made affirmative misstatements. As part of his "Motion to Suppress," Demitri raised allegations that the affiants supporting the search and arrest warrants had recklessly omitted or misstated facts relevant to the probable cause determinations. Even so, the motion included only one passing reference to the standard articulated in *Franks v. Delaware*, 438 U.S. 154 (1978), without citing any additional authority. In addition, the motion mentioned attaching the search warrant and the allegedly misleading affidavit as an exhibit to the motion, but nothing is attached to the motion in the record. Demetri offered no other evidence by way of affidavit or declaration, nor did he present any evidence for the district court's consideration at the hearing on his motion.

There is a presumption of validity in the affidavit supporting the issuance of a search warrant. *Franks*, 438 U.S. at 171. Thus, the general rule is that a court considering a challenge to a search warrant limits its inquiry to the information in the warrant application to determine whether it provided a substantial basis for concluding that probable cause existed. *State v. Molina*, 125 Idaho 637, 639, 873 P.2d 891, 893 (Ct. App. 1993). However, a defendant may be entitled to a hearing, known as a *Franks* hearing, at which additional evidence about the warrant's validity may be presented if he can make "a substantial preliminary showing that a false statement

9

knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [that] the allegedly false statement is necessary to the finding of probable cause . . . ." *Franks*, 438 U.S. at 155-156. The right to such a hearing also extends to deliberate or reckless omissions of material exculpatory information. *State v. Guzman*, 122 Idaho 981, 983–984, 842 P.2d 660, 662–663 (1992).

"To justify a *Franks* hearing, false testimony must be made deliberately or recklessly by a governmental affiant, not by a nongovernmental informant." *State v. Fisher*, 140 Idaho 365, 370, 93 P.3d 696, 701 (2004) (citing *Franks*, 438 U.S. at 171). "A *Franks* evidentiary hearing is not to be lightly granted." *Fisher*, 140 Idaho at 370, 93 P.3d at 701. This Court has further explained:

> The challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross[-]examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and *those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.* Affidavits or sworn or otherwise reliable statements of witnesses should be furnished or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

*Id*. (emphasis added) (quotations and citations omitted).

As for alleged omissions of information from a search warrant, a defendant seeking a *Franks* hearing must show that the omitted information constituted material, exculpatory facts, *and* that the affiant deliberately or recklessly failed to disclose the information. *State v. Kay*, 129 Idaho 507, 511, 927 P.2d 897, 901 (Ct. App. 1996). "An omission of exculpatory facts is material if there is a substantial probability that, had the omitted information been presented, it would have altered the magistrate's determination of probable cause." *Id*. (citation and internal quotation marks omitted).

Against this legal backdrop, and given what information the district court had before it in the record, the district court explained:

> The [c]ourt has reviewed the submissions from the [d]efendant and finds there is not a sufficient basis to hold a *Franks* hearing in this matter. The record does not indicate that law enforcement made false statements knowingly or intentionally, with reckless disregard for the truth. The [d]efendants have also not established that there was omission [sic] of facts that were material. The [d]efendants argue that law enforcement did not provide information regarding a domestic disturbance the family members had, but this information was not sufficient to alter the magistrate's determination of probable cause. There are no statements or omissions in this record

10

that establish the need for a *Franks* hearing. Therefore, the motion for a *Franks* hearing is denied.

    a. <u>The evidence before the district court was enough to allow our review of Demetri's claims on appeal.</u>

Before we can consider the merits of Demetri's argument on appeal, we must evaluate whether sufficient evidence of the alleged omissions underlying the warrant application was before the district court when it denied Demetri's motion to suppress. Clyde and Demetri each filed motions to suppress evidence related to the search warrant. Clyde included an affidavit in support of his motion to suppress and *Franks* hearing. In his legal argument, Demitri simply referenced the alleged misconduct by affiants in support of the search and arrest warrants. Demetri included no evidence or offer of proof with his motion before oral argument.

Now, on appeal, Demetri contends that the district court erred in denying him a *Franks* hearing by providing much more detailed allegations than he did below, arguing that the police intentionally or recklessly omitted exculpatory information from the warrant applications and made affirmative misstatements. Demetri relies, in large part, on Clyde's filing to establish his record.[3] It is also worth noting that the State attached the Affidavit of Probable Cause for Warrant to its response memorandum below as "Exhibit 1," and the Application for Search Warrant and Search Warrant itself as "Exhibit 2."

The district court issued a single opinion denying both defendants' motions, noting, as cited above, that the court found "no statements or omissions in this record that establish the need for a *Franks* hearing."

The arguments Demetri now makes on appeal about the *Franks* issue rely on evidence Demetri did not submit. Rather, Demetri argues that the evidence from Clyde's motion was before the district court, and the court's ruling equally affected Demetri. While the district court issued a joint opinion, Demetri made no effort to join Clyde's motion or otherwise signal to the district court that he intended to rely on Clyde's evidence to the benefit of Demetri's motion, other than by a passing reference to the same during oral argument. Demetri's counsel also requested at oral

---

[3] This Court granted Demetri's motion to take judicial notice of portions of the clerk's record in Clyde's appeal. Clyde's motion to suppress and attached exhibits were part of that motion and are thus properly before this Court in Demetri's appeal.

argument before the district court that it take judicial notice of the preliminary hearing transcript, which it did. But no formal joinder was ever filed.

A review of federal circuit court decisions shows that a co-defendant must expressly join such a motion to benefit from the evidence supporting that challenge. For example, in *Gil Ramirez Group LLC v. Marshall*, the Fifth Circuit explained that it is improper for an appellant to adopt by reference "fact-specific challenges to a verdict" and held that the defendants could not adopt their codefendant's statutory defenses or his challenges to the sufficiency of the evidence. 765 Fed. Appx. 970, 974 (5th Cir. 2019) (citing *United States v. Morgan*, 117 F.3d 849, 853 (5th Cir. 1997)). The Eleventh Circuit has likewise held that challenges to the sufficiency of the evidence could not be imputed to a codefendant because of the fact-specific nature of the challenge.

We need not go that far in this case. The district court's decision on both defendants' motions indicated that the court understood that Demetri was joining in Clyde's motion. Therefore, the record before the district court was sufficient to establish what Demetri found objectionable (through what he argued in his motion to suppress) as the basis for his *Franks* request, even though he did not make a record as he should have. We encourage co-litigants to recognize the need to (1) make an explicit joinder in a co-litigant's motion, or (2) make an adequate showing independently to support their claims. That said, the evidence that all parties implicitly relied on before the district court was sufficient to provide a basis for our review of Demetri's claims here.

b.   Whether Demetri has shown a deliberate or recklessly false omission.

"The first requirement in *Franks* considers whether the defendant has proved the affidavit underlying the warrant contains a deliberate or recklessly false statement or omission." *State v. Mullins*, 164 Idaho 493, 496, 432 P.3d 42, 45 (2018) (citing *Franks*, 438 U.S. at 156); *see also Guzman*, 122 Idaho at 983–84, 842 P.2d at 662–63. As referenced above, the district court denied Demetri's request for a *Franks* hearing in a joint opinion. Demetri argues there was a deliberate or reckless omission from the affidavit underlying the warrant because the affidavit omitted information that showed Demetri was not a suspect. Demetri alleges that the warrant omitted (1) testimony from Labombard describing the intruder as having an hour glass figure; (2) Demetri's height, despite Labombard testifying she thought the intruder was six inches taller than she was (5'2"); (3) that marijuana pipes, methamphetamine pipes, and hypodermic needles were found at Johns' residence; (4) a portion of Christopher's statement to police suggesting that he "feels[s] like [Clyde] would have trashed the place if he was in there"; (5) Virginia was arrested with Clyde on

12

September 26, 2020 for challenging each other to a fight; (6) one of the people in the Johns residence at the time of his murder told police she believed Clyde and Demetri may have killed Johns "because they are Indian and I just figured they're probably. . . ."

Considering the testimony from Labombard first, during the preliminary hearing, Labombard testified that she remembered telling police that one of the intruders she saw in the house "kind of looked like they had an hour-glassy figure[.]" Demetri argues that the omission of this statement was significant because "while they might appear pear shaped, men quite simply do not have hourglass figures." Demetri bears the burden to prove by a preponderance of the evidence that the warrant affidavit contains deliberate or reckless omissions of material exculpatory information. *State v. Guzman*, 122 Idaho 981, 983–984, 842 P.2d 660, 662–663 (1992). Conflicting testimony over whether the figure was pear or hourglass shaped does not meet that burden, nor does Demetri contend that the omission was reckless or intentional.

In the same preliminary hearing, Labombard also testified that she believed the intruder was "[f]ive, six inches" taller than Labombard. Demetri contends that this statement's significance is that one of the responding officers, Detective Brian Erickson, testified that he understood Demetri to be about five feet three inches. Because the warrant application did not reference Demetri's height, when there was allegedly conflicting testimony about whether the intruder was 5'2" or 5'7", Demetri argues that the warrant application intentionally, if not recklessly, omitted that information. In support of that claim, Demetri asserts only a conclusory statement that police omitted this information because it conflicted with their theory that Demetri was one of the intruders. This statement, without more, is insufficient to prove by a preponderance of the evidence that the information was intentionally or recklessly omitted in an effort to mislead the magistrate, and is, at best, a negligent omission.

Next, although Demetri cites a portion of the preliminary hearing transcript from Detective Erickson about finding drugs at Johns' residence, Demetri makes no assertion about what relevance that evidence has to the warrant application or what evidence supports a claim that such information was intentionally or recklessly omitted. Thus, this allegation also fails to show by a preponderance of the evidence that the information was intentionally or recklessly omitted in an effort to mislead the magistrate court.

Demetri also alleges that testimony from Christopher Higheagle was omitted from the affidavit. In the affidavit of probable cause and application for search warrant, Detective Erickson

summarized an interview with Christopher about Christopher's stolen 9mm pistol: "Christopher said nobody had access to the residence that would want to take the pistol and the only person he had issues with was his brother, Clyde K. Ewing, IV." In the transcript of the body camera audio submitted with *Clyde's* motion to suppress, however, the transcript showed that Christopher stated: "The only person I have trouble with is my brother, but I feel like he would have trashed the place if he was in there." Demetri maintains that the warrant application "obviously" and "completely misrepresents" Christopher's statement because it "implies that Clyde may have taken the pistol because Christopher has issues with him when the remainder of that sentence indicates that despite those issues Christopher does not think Clyde took it because he would also trashed the place." As with earlier allegations, Demetri does not provide argument or evidence to show that the way Detective Erickson summarized the police interview with Christopher, or the detective's decision not to provide a summary related to Christopher's feeling that Clyde would have "trashed" his residence, was an intentional or reckless omission, nor does Demetri explain what relevance Christopher's statement about Clyde has to Demetri.

Demetri next points out that the magistrate was not made aware that Clyde and his sister Virginia were both arrested on September 26, 2020, for challenging each other to fight. Because of this earlier incident, Demetri maintains that Virginia "clearly has a pre-existing and serious dispute with Clyde, and thus bias." This allegation *may* have some relevance to a bias against Clyde, but again, Demetri does not provide argument or evidence to show either (1) that Virginia's arrest caused her to have bias against Demetri or (2) that the decision not to inform the magistrate about Virginia's arrest was an intentional or reckless omission. Even still, the information in the affidavit suggested that there were issues between Virginia and Clyde, including an allegation from Virginia that Clyde "had vandalized and spray painted 'bitch boy' on her mother's car" and "had been causing problems for her and other family members for the past several months." As a result, while the specifics about the prior arrest were not referenced, the underlying issues between Virginia and Clyde were presented to the magistrate court.

Finally, Demetri asserts that one of law enforcement's sources of information, Katrina McGarvey, demonstrates bias and racial animus against Clyde and Demetri, which was not shared with the magistrate court. McGarvey told police that she believed Clyde and Demetri may have killed Johns "because they are Indian and I just figured they're probably. . . ." Notwithstanding the racial component to McGarvey's testimony, no statements from her were included in the warrant

14

application. McGarvey was in the residence when Johns was shot, but she was upstairs and did not provide any eyewitness statements to police. It does not appear any information from McGarvey was presented to the magistrate court in consideration of whether to issue the warrant.

Demetri's request for a *Franks* hearing below and his challenge to its denial on appeal was conclusory and not accompanied by affidavits or other sworn statements. Demetri's appellate argument is thus without sufficient foundational evidence from the record to back it up. While Demetri's counsel successfully moved the district court to take judicial notice of the preliminary hearing transcript in his case, his alleged *Franks* omissions, which rely on evidence he did not submit to the district court (i.e., Christopher's stolen pistol report, Virginia' and Clyde's arrests for challenging each other to fight, and Katrina McGarvey's racist statement), are fatally undermined by this lack of supporting evidence. Nor has he shown on appeal that the district court's factual conclusions were clearly erroneous. "Th[e] Court 'gives deference to the trial court's findings of fact, which will be upheld so long as they are not clearly erroneous.' " *State v. Van Zanten*, 173 Idaho 620, 623, 546 P.3d 163, 166 (2024) (quoting *State v. Lancaster*, 171 Idaho 236, 240, 519 P.3d 1176, 1180 (2022)). Again, the district court found that "[t]here are no statements or omissions in this record that establish the need for a *Franks* hearing." As a result, we affirm the district court's denial of Demetri's motion to suppress.

**B.** **The district court erred by admitting video testimony from Debra Moffatt, but that error did not affect the outcome of Demetri's trial.**

The State filed a motion in limine in December 2021 to admit statements that Moffat made in a video interview with Detective Stormes of the Lewiston Police Department. The State argued the statements were admissible because Moffat had died before trial and was unavailable to testify. Although Clyde filed a written objection to the State's motion in his case, Demetri did not formally object to that motion. The district court heard oral arguments on the State's motion at a joint hearing.

The district court issued a joint opinion and order on the State's motion, admitting Moffat's statements. The district court's decision did not consider the applicability of the Confrontation Clause but found that the statements met the reliability requirements of the hearsay exceptions under Idaho Rules of Evidence 803(1), 803(24), and 804: "Moffat was present in the room where Samuel Johns was shot, she heard the voice of an assailant as well as the shooting. There are

15

circumstantial guarantees of trustworthiness, including those similar to a present sense impression. Overall, the requirements set forth above have been met."

Demetri contends, for the first time on appeal, that the district court's admission of videotaped statements made by Moffat violated the Confrontation Clause under *Crawford v. Washington*, 541 U.S. 36 (2004). The State concedes that the statements should have been excluded because they were testimonial, and Demetri had no opportunity to cross-examine Moffat. Even so, because Demetri did not argue below that the district court's admission of the videotaped interview violated the Confrontation Clause, his argument must be analyzed under the fundamental error standard. *State v. Perry*, 150 Idaho 209, 226, 245 P.3d 961, 978 (2010).

To obtain relief under the fundamental error doctrine, a defendant must demonstrate: (1) "one or more of the defendant's unwaived constitutional rights were violated"; (2) the error is "clear or obvious" on the record "without the need for any additional information," including information "as to whether the failure to object was a tactical decision"; and (3) "the error affected the defendant's substantial rights," by showing a reasonable possibility that the error "affected the outcome of the trial proceedings." *Perry*, 150 Idaho at 226, 245 P.3d at 978.

Demetri can meet the first two prongs under *Perry* because Moffat's statements were testimonial and the failure to object to the video under *Crawford* was not strategic. Thus, whether the video's admission constitutes fundamental error turns entirely on the third prong of *Perry*. Under that prong, the defendant "must demonstrate that the error affected [his or her] substantial rights, meaning (in most instances) that it must have affected the outcome of the trial proceedings." *Perry*, 150 Idaho at 226, 245 P.3d at 978. This is not a mere "reasonable possibility" standard, but instead, it must be clear from the appellate record that the error "actually" affected the outcome of the trial proceedings. *State v. Miller*, 165 Idaho 115, 120, 443 P.3d 129, 134 (2019).

Demetri's argument turns entirely on the conflicting statements between Labombard and Moffat. Demetri argues that admitting Moffat's testimony on the video affected the outcome of the trial because it was the "only real time . . . rebuttal to Patricia [sic] Labombard's [identification] of the perpetrator [was offered.]" This is largely the same argument Demetri advanced to challenge the district court's decision to deny his motion to suppress. As advanced here, Demetri reiterates that Labombard's testimony identified the assailant as a female. And, "[i]f the jury believed Patricia [sic] Labombard, then none of the other evidence matters." Demetri argues that Moffat's

16

statement that one of the intruders "didn't sound female to me" allowed the jury to ignore Labombard's testimony and overlook a fatal flaw in the State's case.

"It is the jury's function to assess the demeanor of the witnesses and make a determination of credibility. . . . This Court will not second-guess the jury's determination on credibility or the weight to be given to witnesses' testimony." *State v. Perry*, 139 Idaho 520, 525, 81 P.3d 1230, 1235 (2003) (quoting *State v. Allen*, 129 Idaho 556, 558, 929 P.2d 118, 120 (1996)).

Demetri's claim that the jury ignored Labombard's testimony because Moffat gave a conflicting statement about the intruder's gender is unavailing. The State presented substantial evidence that the Ewings executed a plan to murder Johns. Moffat stated that on the day Johns was killed, she was awakened by someone telling her to put her face in the bed—she complied with the order. She heard a "pop pop" sound and then saw Johns had been shot. Detective Stormes then asked if the voice of the intruder was "a man's voice," and Moffat responded, "no, it was a youngster, it was a younger person, it didn't sound female to me." Finally, Moffat relayed that she did not see the gun or the intruder's face.

The State's case establishing Demetri's guilt relied on connecting physical evidence found at and near the scene of the murder with evidence found in the Ewings' motel room, uncovering a motive for the murder, compiling surveillance video from various sources near the scene of the murder and near the Ewings' motel depicting two individuals on bikes around the time of the murder, and the discovery of Demetri's fingerprints and DNA on evidence found near the murder scene.

Specifically, as addressed extensively above and summarized here, the State showed that numerous pieces of evidence left at and near the murder scene–zip ties and duct tape–matched zip ties and tape recovered from the motel room. Many of the zip ties recovered from the murder scene were fashioned into restraints with tape; meanwhile, cut or torn zip ties and tape were found at the motel room. Admitted surveillance video from a nearby Walmart showed the Ewings purchasing zip ties before the murder, and a receipt for the purchase of a sweatshirt similar to the tag for one of the sweatshirts found near the site of the murder was found in the Ewings' motel room. A compilation video admitted at trial, accompanied by testimony and containing maps and surveillance video footage, showed two individuals riding bikes and wearing dark clothes near the Ewings' Clarkston motel shortly before the murder, and near the scene of the murder shortly after it occurred. Bike tracks were found leading west away from the scene of the murder, and two bikes

17

with mounted lights were recovered from the Ewings' motel room. A Clarkston police officer, who was familiar with the Ewings, testified that he believed he saw them about an hour before the murder in Clarkston–wearing face masks, dressed in all dark clothing, and on mountain bikes.

Demetri and Clyde were both found to have gun powder residue on the clothes they were wearing when they were arrested. A spent shell casing found in a backpack recovered from the Ewings' motel room, and two shell casings found at the scene of the murder, were all tested and found to have been fired from the same weapon. Demetri's fingerprints were found on a backpack near the scene of the murder, and DNA consistent with Demetri was found on a zip tie nearby. A motive for the murder was revealed—Virginia testified about how Clyde was obsessed with a backpack that he believed was stolen and was at the residence where the murder was committed. Samuel Johns' older brother testified that during the month before the murder, he heard the Ewings banging on the house and he went downstairs and chased them away. During that same month, the house and two vehicles at the residence were vandalized with the word "bag" spraypainted on their exteriors. Virgínia also testified about this vandalism.

The primary probative value of Moffat's statement was that one of the intruders sounded like a younger person and did not sound like a woman. Her recorded statement differed from another witness from the home, Labombard, who testified that the intruder "sounded like a young woman" and tended to explain why Labombard's perception was mistaken. Weighed against all other evidence presented by the State, the probative force of the error of admitting Moffat's statements was minimal.

Against all other evidence presented by the State, Demetri failed to show that admitting the Moffat video affected the outcome of his trial.

## V.    CONCLUSION

We conclude that probable cause supported the issuance of both the arrest and search warrants, as well as the warrantless arrest of Demitri. While the district court erred in admitting Moffat's statements, we further conclude that this error did not affect the outcome of Demetri's trial. As a result, the district court's judgment of conviction is affirmed.

JUSTICES BRODY, MOELLER, ZAHN, and MEYER CONCUR.